UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 19-60262-cr-WPD

UNITED STATES OF AMERICA

vs.

ROSENDO LOUIS,

    Defendant.
_____/

## FACTUAL PROFFER

The United States Attorney's Office for the Southern District of Florida and ROSENDO LOUIS (defendant) agree that if this case had gone to trial, the government would have proven beyond a reasonable doubt the following facts, which occurred in the Southern District of Florida:

1. Since approximately 2017, the FBI Miami Field Division has been conducting an investigation into a Drug Trafficking Organization (DTO) involved in international narcotics trafficking and money laundering. As part of the investigation, the FBI has worked with several confidential sources. In early 2018, agents were approached by Confidential Source #1 (CS #1) who stated that he/she had information regarding a DTO. Several individuals have been arrested and charged based on that investigation. One of the individuals, cooperating defendant (CD#2) has agreed to assist the United States and testify against the defendant.

2. Between February of 2018 and June of 2018, CS#1 and CD#2 had numerous conversations about narcotics, and many of these conversations contain references to the defendant, Rosendo Louis aka "Sendo."

1

3.      On February 19, 2018, CS#1 told the agents that he was contacted by CD#2 who asked CS#1 if he wanted to purchase cocaine. When the CS#1 told CD#2 that he (CS#1) was not ready, CD#2 stated that he would contact "Sindo" or "Sendo."     According to CS#1, CD#2 later told him that the defendant was going to purchase the cocaine and would be coming to pick up the cocaine from CD#2.

4.      On February 24, 2018, CS#1 met with CD#2.  This conversation was recorded. CD#2 told CS#1 that there was a load of "54" and "seventy something" that was seized, and $900,000 that was also seized.  CD#2 also states that he "was waiting for the other one".

5.      On March 6, 2018, CS#1 reported to agents that that the defendant had purchased at least two kilograms of cocaine from CD#2 prior to CS#1 signing up as a source.  CS#1 also provided telephone number for the defendant (954) 913-2411.

6.      On March 13, 2018, CD#2 spoke to CS#1 on the telephone, and met with him. The calls and meeting was recorded.  During one of the calls, CD#2 told CS#1 that he was meeting with "Sendo", the defendant.  At a meeting, CD#2 told CS#1 about conversations he had with the defendant.  During the conversation, CD#2 tells CS#1 that he (CD#2) had a conversation with "Sendo" about doing "one at a time."  CD#2 complains that "he" never called him back" and that he has "two" waiting for him (the defendant).  CD#2 further states that the drugs are not with the same person, and "now I got my boy" and the co-defendant.  CD#2 further states that the defendant bought two halves from him and that he took the half to him.  CD#2 also stated that if he (the defendant) sells more than two a week, he (CD#2) would leave the price at "17".    CD#2 steps away, and when he returns, he tells CS#1 that, "They just bought 50 last week."  CD#2 also stated that he asked for "one and half" and he gave half to the defendant.  Law enforcement agents

2

would testify that based on their experience and training, the "halves" refer to one-half kilograms of cocaine, and that the reference to bringing "50" referred to bringing narcotics to the South Florida area.

7. On March 20, 2018, CS#1 reported to agents that he had spoken with the defendant. According to CS#1, the defendant told CS#1 that he (the defendant) had received two kilograms of cocaine on Wednesday, March 14, 2018. According to CS#1, the cocaine was delivered in the evening to the defendant by CD#2, CD#2's "cousin" and another guy. CS#1 stated that the defendant stated that all three individuals travel in the same car. The price per kilogram was $27,500. The defendant told CS#1 that he (the defendant) had ordered three kilograms but only two kilograms were delivered because CD#2 did not want to travel with more than two kilograms of cocaine.

8. On March 27, 2018, there were telephone calls (these calls are recorded) between the CD#2 and CS#1 discussing that CD#2 is looking for the defendant and that he (CD#2) sent the defendant a text message to "let him know I was ready." CD#2 asked CS#1 to contact the defendant to see if he "needed something. Today or tomorrow."

9. On April 3, 2018, CS#1 met with CD#2. This meeting is recorded. CD#2 tells that CS#1 that he (CD#2) had one and complains that "he" never called him back for the second one he ordered. CD#2 complained that he had given the defendant a price of 27 because he was buying two, but he was upset because "Sendo" didn't purchase both. Because CD#2 charged CS#1 $27,500 for a kilogram of cocaine, agents believe that CD#2 was attempting to sell kilograms of cocaine to the defendant.

3

10. On April 12, 2018, during the controlled purchase (meeting recorded), CD#2 tells CS#1 that "Sendo has been working hard".

11. On April 27, 2018, CD#2 contacted CS#1 by telephone, and told CS#1 that he (CD#2) had cocaine available (this call is not recorded). CD#2 also told CS#1 that he was going to meet with the defendant soon. CS#1 told CD#2 that his (CS#1's) purchaser backed out at the last minute as an excuse not to purchase cocaine. CS#1 also reported that later on that day CD#2 contacted him and offered to sell him six ounces of cocaine for $4,500. According to CS#1, the defendant also contacted CS#1 and told him that CD#2 had contacted him (the defendant) about buying a kilogram of cocaine. When the defendant stated that he did not need that much, CD#2 agreed to let the defendant pay for a portion of the kilogram but then gave the defendant the entire kilogram so that he (the defendant) could sell it and then pay CD#2 later.

12. On May 8, 2018, CD#2 spoke to CS#1 on the telephone. CD#2 told CS#1 that he (CD#2) talked to the defendant and he (CD#2) was going to see if the defendant was going to be ready. On that same date, CS#1 reported to law enforcement agents that CD#2 and his co-defendant had supplied "Sendo" (the defendant) and another drug dealer with two kilograms of cocaine.

13. On May 18, 2018, CD#2 asked CS#1 if he could bring some "bread" from that "Sendo" (the defendant) owed him if CS#1 was coming down. (This conversation is recorded.)

14. On May 23, 2018, CS#1 reported that the defendant had called him (CS#1) on May 22, and complained that he had recently purchased two kilograms of cocaine from CD#2 and that the quantity was poor. According to CS#1, the defendant was upset because CD#2 was not returning the defendant's telephone calls. According to CS#1, the defendant stated that he was

going to order more cocaine from CD#2 then rob him to make up for the bad cocaine that he had received. According to CS#1, he spoke to the defendant on May 23 as well and that the defendant was still angry with CD#2, and that CD#2 owed him (the defendant) for the bad cocaine, and that the defendant was going to make sure that CD#2 paid him (the defendant) back.

15. On May 24, 2018, CS#1 talks to CD#2 by telephone. (This call was recorded.) CS#1 tells CD#2 that "Sendo" (the defendant) is angry with CD#2. When CD#2 asks CS#1 about Sendo (the defendant), and CS#1 tells CD#2 that he (the defendant) is upset about the quality. CD#2 states that he is going to give "Sendo" (the defendant) a call. CD#2 also says that he is going to give 500 dollars back to "Sendo" (the defendant). CD#2 also stated that the defendant has to check "that."

16. On May 31, 2018, CD#2 met with CS#1. (The meeting is recorded.) CD#2 asked CS#1 about the defendant and stated that he was going to give the defendant a call, and return $500 to the defendant. CD#2 also told CS#1 that his "cousin" (believed to be co-defendant) "his guy" (believed to be a supplier of cocaine) "was going to get something else".

17. On June 28, 2018, CS#1 reported to law enforcement agents that CD#2 had told him that the truck would be coming to South Florida within the next two weeks. CS#1 also told law enforcement agents CD#2 planned to make things right with the defendant and CD#2 knew he had sold the defendant bad cocaine.

18. On July 2, 2018, CS#1 meets with CD#2. (This meeting is recorded.) They discuss the incoming shipment. CD#2 also asks CS#1 about "Sendo" (the defendant). CS#1 tells CD#2 that he has spoken with "Sendo" (the defendant) and that he was not happy with the

5

cocaine that CD#2 supplied. CD#2 talks about the quality of the cocaine he supplied to "Sendo" (the defendant) and states that "My cousin's guy ...." "no no we don't check it."

19. CD#2 and his co-defendants received 49.9 kilograms of cocaine on September 3, and were arrested just after the delivery was made.

20. CD#2 was de-briefed on March 1, 2019. He was able to identify a photograph of the defendant. CD#2 estimated that he sold kilograms of cocaine to the defendant and another person between the time he stopped working for the FBI in 2017 and his arrest in 2018. He told agents that he would deliver cocaine to the defendant at the defendant's townhouse, and that his co-defendant always accompanied him to handle the money and the cocaine. CD#2 also conducted at least two transactions with the defendant at CD#2's prior residence. CD#2 also stated that he usually sold kilograms to the defendant but that he had sold the defendant a half a kilogram on one occasion.

21. There were pen registers up on the defendant's cell phone and CD#2's phone, which confirms that they were in contact. Agents would testify that they also obtained information regarding the location of CD#2's cell phone. An analysis of the location of CD#2's telephone confirms that he was apparently in and around the north Broward areas (where vthe defendant resides), specifically on March 14, April 27, and May 8, the dates when he delivered cocaine to the defendant.

22. There was also a tracker on the co-defendant's vehicle, which a Fort Lauderdale Police detective will testify, puts the co-defendant's vehicle in approximately the same area in Broward County on April 27, May 1, and May 8.

23. On July 18, 2018, a Coral Springs Police Department officer working a burglary patrol observed the defendant enter the front passenger seat of a black BMW driven by a female. The BMW had been sitting at the curb in front of a group of apartments. The officer noticed a large crack in the windshield and he also noticed that the vehicle turned onto Wiles Road without stopping.

24. The officer stopped the BMW. When the officer approached the vehicle, he could immediately smell the odor of marijuana. He asked the driver of the vehicle, a female, where they were coming from. She stated that she just picked the defendant up, and the defendant stated he was visiting his cousin. When asked to exit the vehicle, both became defensive and told the officer that they did not consent to the search of the vehicle, and that he did not have probable cause to enter the vehicle.

24. A dog sniff was conducted, and there was a positive alert to the odor of narcotics. A search of the vehicle was then made. The search found 56.2 grams of alleged methamphetamine in two bags, and 28.2 grams of cocaine in bags and 14.2 grams of marijuana, all in one bag under Louis's seat. The defendant and driver of the vehicle were placed under arrest. A search of the defendant found four plastic baggies in his back left pants pocket. In each baggie were numerous small baggies of different colors that were consistent with the sales of narcotics.

25. Detectives obtained a search warrant for the telephones seized from the defendant. The telephones revealed discussions between the defendant and his buyers asking for certain amounts of "pink".

26. Detectives also listened to the defendant's jail calls. The defendant calls using the PIN number for other inmates. In one call, in Creole, the defendant told his roommate, that there is large amount of money in the dresser drawer to pay attorney's fees. In another call, the defendant discusses with a female that the police won't find anything in his room, because he keeps it clean.

27. The officers continued their investigation and on July 31, conducted a dog sniff near 5051 Wiles Road, #102. The defendant listed this address as his residence with his federal probation officer. The canine alerted on the lower corner of the door of the apartment #102. Detectives obtained a search warrant, and returned on August 1, to search the premises.

28. In a cabinet under the kitchen sink was two paper bags that contained hundreds of small baggies that were an exact match as to both type and color to the items found under the seat of the vehicle that the defendant was riding in. Approximately 118 grams of cocaine were seized from the apartment in a bathroom associated with the roommate.

Accordingly, with respect to count 1 in the indictment, charging the Defendant with a violation of Title 21, United States Code, Section 846, the government would have proven beyond a reasonable doubt that: (1) that two or more persons, in some way or manner, came to a mutual understanding to try to accomplish a common and unlawful plan, as charged in the indictment; (2)

that the Defendant, knowing the unlawful purpose of the plan, joined in it; and (3) that the object of the unlawful plan was to possess with the intent to distribute 500 grams or more of a mixture and a substance containing cocaine, as charged.

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

Date: 1/10/20      By: *Cynthia R. Wood*
                        CYNTHIA R. WOOD
                        ASSISTANT UNITED STATES ATTORNEY

Date: 1/10/2020    By: *[signature]*
                        JAN SMITH
                        ATTORNEY FOR DEFENDANT

Date: 1/10/2020    By: *[signature]*
                        ROSENDO LOUIS
                        DEFENDANT